GEOFFREY A. HANSEN
Acting Federal Public Defender
Northern District of California
JEROME E. MATTHEWS
Assistant Federal Public Defender
13th Floor Federal Building - Suite 1350N
1301 Clay Street
Oakland, CA 94612
Telephone:   (510) 637-3500
Facsimile:   (510) 637-3507
Email:       Jerome_Matthews@fd.org

Counsel for Defendant Bruce

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CHRISTOPHER BRUCE,<br><br>Defendant. | **Case No.:** CR 21 009 YGR<br><br>**CHRISTOPHER BRUCE'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE**<br><br>**Court:**       Courtroom 1<br>**Hearing Date:**  October 28, 2021<br>**Hearing Time:**  9:00 a.m. |

## PRELIMINARY STATEMENT

Christopher Bruce will stand before the Court on October 28, 2021, prepared to enter a guilty plea to a single count of being a felon in possession of ammunition. He does not contest any aspect of the government's case, but asks that the Court take into account a number of factors in deciding the appropriate sentence.

The probation officer has recommended a mid-range sentence of 30 months based on a guidelines range to which both the government and Mr Bruce object. Mr Bruce submits that application of the relevant section 3553(a) factors support a sentence of 18 months, irrespective of

1  whether the Court agrees with the probation officer's calculations, and asks the Court to sentence him

2  accordingly.

### SUMMARY OF OFFENSE

4  This is not a complicated case. Oakland Police contacted Mr Bruce after effecting a traffic stop

5  on a car that had been reported stolen. A subsequent search yielded the ammunition that is the basis

6  for the section 922(g)(1) count Mr Bruce will plead to.

7  The probation officer captures some of the events that shaped the arc of Mr Bruce's life and his

8  involvement in the criminal justice system. There are additional facts, however, that merit discussion.

9  Foremost among them is Mr Bruce's reaction to the death of his younger brother, and the high

10  profile, ill-founded criminal case against his mother that preceded it.

11  The foregoing is by no means exhaustive; rather, it must be considered not only with Mr

12  Bruce's mental health issues and substance abuse, but also with his kindness, service to those less

13  fortunate than himself, and desire to find a stable and responsible social circle.

### OBJECTIONS TO THE PSR

15  Mr Bruce has reviewed the PSR and lodges the following objections:

16  ¶¶ 20, 21, 24. Mr Bruce does not believe that the destructive device enhancement applies here.

17  While he did possess so-called M1000's, not everything that explodes is a destructive device as

18  defined by 26 U.S.C. § 5845. According to ATF, the agency that regulates explosive devices, many

19  products are labeled or described as M1000's but are produced by legitimate commercial firework

20  manufacturers. The key is the amount of internal composition; anything containing 50 milligrams or

21  less of pyrotechnic composition is not a banned explosive. *See* 16 CFR 1500.17, *et seq.* There is no

22  evidence before the Court regarding the weight of the internal composition of any of the seized

23  evidence in this case.

24  Equally important is that for regulated devices, such as explosives, a defendant must not only

25  knowingly possess the device but also know the specific features of the device that bring it within the

26  scope of the governing statute. *United States v. Robinson*, 2018 WL 4512068 (D. Nev. 2018)

27  (unpublished), citing *Staples v. United States*, 511 U.S. 600, 619 (1994). Here there is no evidence

28  that Mr Bruce was aware of the internal composition's weight of any of the seized evidence.

1    In any event, the probation officer's reliance on the commentary to USSG §2K2.1 (PSR

2    Addendum, ¶¶ 3–8) is unavailing. In *Stinson v. United States*, 508 U.S. 36 (1993), the Supreme Court

3    explained that commentary may only "interpret [a] guideline or explain how it is to be applied." 508

4    U.S. at 42 (internal quotation marks omitted). Commentary cannot add to an already-complete

5    definition in the text of the guideline because commentary has "no independent force." *United States*

6    *v. Rollins*, 836 F.3d 737, 742 (7th Cir. 2016) (en banc).

7    Recently, the Supreme Court's decision in *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019),

8    "reinforce[d] the limits" of the deference courts owe to an agency's interpretation of its own

9    regulation. 139 S. Ct. at 2423. The Court explained that "the possibility of deference can arise only if

10   a regulation is genuinely ambiguous . . . even after a court has resorted to all the standard tools of

11   interpretation." *Id*. at 2414 (emphasis added). "If uncertainty does not exist, there is no plausible

12   reason for deference. The regulation then just means what it means—and the court must give it effect,

13   as the court would any law." *Id*. at 2415.

14   If Guidelines commentary were not subject to this restriction, then the Sentencing Commission

15   could issue binding commentary without congressional approval, violating both the constitutional

16   separation of powers and the Sentencing Reform Act's mechanism in 28 U.S.C. § 994(p) for

17   promulgation of Guidelines. *See Kisor*, 139 S. Ct. at 2415 (explaining that such deference would

18   permit the agency, "under the guise of interpreting a regulation, to create de facto a new regulation")

19   (citation omitted); *United States v. Shell*, 789 F.3d 335, 340 (4th Cir. 2015) (holding that the

20   government cannot "skip[] past the text of § 4B1.2 to" add offenses to the "crime of violence"

21   definition through commentary).

22   *Kisor* gave final approval to the analysis that a number of circuit Courts of Appeal already had

23   undertaken. *E.g.*, *United States v. Havis*, 927 F.3d 382, 385-87 (6th Cir. 2019) (reversing conviction

24   on the grounds that the Guideline commentary could not expand the textual definition of "controlled

25   substance offense" in §4B1.2(b) to include attempt crimes; *United States v. Soto-Rivera*, 811 F.3d 53,

26   60 (1st Cir. 2016) ("There is simply no mechanism or textual hook in the Guideline that allows us to

27   import offenses not specifically listed [within the text of the Guideline itself] into § 4B1.2(a)'s

28   definition of 'crime of violence.'"); *Shell*, 789 F.3d at 340 ("it is the text, of course, that takes

precedence"); *cf. United States v. Nasir*, 982 F.3d 144, 159-60 (3rd Cir. 2020) (sua sponte ordering rehearing en banc, overruling prior circuit precedent in light of *Kisor*, and holding that it was inappropriate to defer to the Sentencing Commission's commentary to USSG § 4B1.2. which expands definition of controlled substance offense to include inchoate offenses such as conspiracy or attempt).

¶¶ 26, 27. Absent the 2-level destructive device enhancement, the adjusted offense level should be 12, with a corresponding guidelines range of 21 to 27 months. Should the Court choose to apply the enhancement, Mr Bruce nonetheless maintains that the offense level and guidelines range are not properly calculated. If, as the probation officer calculates, the adjusted offense level is 16, the decrease for acceptance of responsibility is three levels, not two. USSG §3E1.1(b). At a total adjusted offense level of 13, the applicable guidelines range is 24 to 30 months.

## SENTENCING RECOMMENDATION

Criminal "punishment should fit the offender and not merely the crime." *Williams v. New York*, 337 U.S. 241, 247 (1949). That requires "the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 52 (2007) (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996) (quotations omitted)). Ultimately, the "overarching statutory charge for a district court is to 'impose a sentence sufficient but not greater than necessary'" to reflect the factors detailed in 18 U.S.C. § 3553(a). *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (*en banc*) (quoting 18 U.S.C. § 3553(a)). The § 3553(a) factors assist the Court in fulfilling its mandate to make "an individualized assessment of a particular defendant's culpability rather than a mechanistic application of a given sentence to a given category of crime." *United States v. Barker*, 771 F.2d 1362, 1365 (9th Cir. 1985).

A substantively reasonable sentence, then, will moderate the need for deterrence and punishment with the factors that made Mr Bruce's life particularly difficult. Mr Bruce does not suggest that his life experiences in any way excuse what he has done, but they do provide an appropriate framework within which the Court may determine what sentence is sufficient but not greater than that necessary to meet section 3553(a)'s criteria.

1    On this record, 18 months in custody is just such a sentence.

2    **I.    Mr Bruce's History and Characteristics**

3    If the story of Mr Bruce's upbringing reads like a celebrity drama it is because it's close to being

4    one. His biological father was a noted Broadway performer and dancer. Prior to becoming a

5    physician, his mother, Cheryl Bryant-Bruce was a film and stage actress. While this might suggest

6    that Mr Bruce led a life of privilege, that is not the case.

7    As noted in the PSR, and described in detail by Dr Bryant-Bruce[1], Mr Bruce's biological father

8    was physically abusive and addicted to drugs. Financial and emotional support were in short supply.

9    They divorced when Mr Bruce was quite young and Dr Bryant-Bruce resolved not to allow Mr Bruce

10   "to see me being abused and to accept that as a normal way to deal with women and children."

11   Things came to a head following Dr Bryant-Bruce's marriage to her second husband. She

12   became pregnant and gave birth to Gregory, who unfortunately was born with a rare liver disease that

13   left him frail. Mr Bruce bonded with Gregory immediately, filling the emotional void left by his

14   biological father. An accidental fall from his bed left Gregory with injuries that led doctors to believe

15   he had been abused and Gregory was taken from the family by the state child protective services

16   agency. Dr Bryant-Bruce knew better and was convinced that Gregory had been misdiagnosed. She

17   "kidnapped" him from his placement and had him examined by other medical professionals. This led

18   to a high profile criminal case against Dr Bryant-Bruce. She ultimately prevailed, and the late Johnnie

19   Cochran, who represented her, was able to show (in an even higher profile case) that the severity of

20   Gregory's injuries were not caused by abuse but by his pre-existing medical condition. The judge

21   who originally upheld the protective agency's decision to remove Gregory from the home thereafter

22   reversed his order. PSR, ¶ 49.[2]

23   Mr Bruce was reunited with his younger brother, but the damage already had been done. The

24   accusations and media scrutiny left him distrustful of authority and he became withdrawn. When his

25   stepfather left the family for a mistress, Mr Bruce directed virtually all of his energy and attention to

26

27   _____

28   [1] A letter of support from Dr Bryant-Bruce is attached as Exhibit 1.

     [2] An Atlanta Journal and Constitution newspaper article describing the case is attached as Exhibit 2.

CHRISTOPHER BRUCE'S SENT MEMO
*BRUCE*, CR 21–009 YGR

5

Gregory, but Gregory ultimately succumbed to his disease and died. Mr Bruce was inconsolable. He stopped attending school, began to use drugs and his life spun out of control.

Despite the foregoing litany of emotional trauma, Mr Bruce is a caring, generous and talented man. These traits have not gone unnoticed, as well-known community activists can attest. Keith Williams, who is responsible for transforming DeFremery Park into an Oakland skateboarding haven, observes that Mr Bruce "came to DeFremery Park approximately twice a week for two or three years to skateboard and help youngsters new to the sport." Mr Williams found Mr Bruce to be "pleasant, respectful and a very good mentor for the kids." Declaration of Frank Tamburello ("Tamburello Decl."), ¶ 3 and Exhibit A.

Biseat Horning, a local environmental educator, echoes these observations of Mr Bruce's character. During a chance meeting at an Oakland restaurant Mr Bruce showed interest in her work as an activist and advocate for the homeless. Mr Bruce subsequently volunteered in her program by preparing and delivering food and care packages to homeless individuals. Tamburello Decl., ¶ 5.[3]

When these traits are weighed against Mr Bruce's involvement in the criminal justice system, it becomes apparent that Mr Bruce continues to struggle to find his place. According to his mother, Mr Bruce has a tendency to gravitate towards anyone who will accept him, and this has often landed him in trouble. With close supervision, intensive mental health counseling and therapy, Mr Bruce can appropriately direct his talents and his generosity.

## II.   A Sentence of 18 Months is Just Punishment

Mr Bruce is far more than the sum of his criminal history points. The present offense is serious, but it is noteworthy that Mr Bruce has no violence in his background and there is no record of him having ever having ever used a gun or ammunition in any manner beyond simple possession.

The request for a variance in this case is modest. While Mr Bruce has had problems adjusting to supervision in the past, it is less clear what precise treatment methods were offered to him. Given the flat affect he has exhibited since his release in 2016, his lack of stable housing and his residual stress-related disorders, it is clear that Mr Bruce needs help and lots of it. The goal should be to offer him

1    that help sooner rather than later.

2        Equally important is that the government has chosen not to recommend a specific sentence; Mr

3    Bruce's request for this modest variance is therefore effectively unopposed.

4    **III.    The Totality of the Circumstances Justify a Sentence of 18 Months**

5        A number of factors militate in favor of leniency in this case, each for a discrete reason. But

6    individual reasons do not limit the Court's ability to consider the totality of the circumstances. Even

7    prior to *Booker*, the district court could base its sentence on an aggregation of factors, each of which

8    might individually have been insufficient to justify departure, or now, a variance. *United States v.*

9    *Cook*, 938 F.2d 149, 153 (9th Cir. 1991).  In *Cook* the court explained that "[t]here was no reason to

10   be so literal-minded as to hold that a combination of factors cannot together constitute a 'mitigating

11   circumstance.'" *Id.* at 153.  When a combination of factors is posited as a basis for a downward

12   departure, the question becomes whether in totality they present a uniquely mitigating set of

13   circumstances. *Cook* elaborated further on this principle, noting that factors that appear insufficient in

14   isolation can present a compelling mosaic when viewed together:

15           Given the Sentencing Commission's acknowledgment of 'the vast range of
16           conduct' not encompassed by the Guidelines, a unique combination of
             factors may constitute the 'circumstance' that mitigates. ...  What the
17           Commission has focused on is 'the case' conduct.  Neither case nor conduct
             can be reduced to a single factor.  Case and conduct are a total pattern of
18           behavior.  In making a decision in any particular case, good judgment will
             often require the evaluation of a complex of factors.  No single factor may
19           be enough to point to the wise course of discretion.  But a wise person will
             not look at each particular factor abstractly and alone. *Rather it will be how*
20           *the particular pieces fit together, converge, and influence each other that*
             *will lead to the correct decision.*
21

22       *Id.* at 153 (emphasis added); s*ee also United States v. Colace*, 126 F.3d 1229, 1231 n.2 (9th Cir.

23   1997) (considering non-qualifying factors by aggregating into a totality of circumstances analysis).

24       *Cook's* endorsement of aggregation rings true here. Mr Bruce has several facets to his

25   personality, and competing impulses. He understands that he needs help, and is poised to take

26   advantage of his time in custody and return to society with coping mechanisms suited to the issues

27   with which he continues to struggle. Under the circumstances, a sentence of 18 months is sufficient

28   but not greater than necessary to accomplish this result.

1
2
3                                    **CONCLUSION**
4          For the reasons stated, Christopher Bruce respectfully requests that the Court impose a sentence
5   of 18 months followed by three years of supervised release.
6
7     Dated:     October 21, 2021                Respectfully submitted,
8                                                GEOFFREY A. HANSEN
                                                 Acting Federal Public Defender
9
10                                               _____/S_____
11                                               JEROME E. MATTHEWS
                                                 Assistant Federal Public Defender
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 1

**EXHIBITS IN SUPPORT OF CHRISTOPHER BRUCE'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE**



CherylBryantBruceMD.com

Cheryl BryantBruce, MD
Chief Executive Officer
Medical Director

October 19, 2021

Re: Christopher Gabriel Bryant-Bruce
PFN: BLH986

Jerome E. Matthews

Assistant Federal Public Defender

1301 Clay Street

Suite 1350N

Oakland, CA 94612

Attn: The Honorable Yvonne Gonzalez Rogers

Your Honor:

I am Cheryl BryantBruce MD, mother of Christopher Gabriel Bryant-Bruce, PFN BLH986. I am writing in support of my son to give you some background on who he is as a person, outside of the institution of incarceration. I do not write to make excuses for his behavior, but to give you some insight into some of the things that I believe to factor into his behavior. I also wish to impress upon you the fact that my son is far more than his police record would lead you to believe.

I left his father Bruce Anthony Davis, not because I didn't love him, but because he was abusive. He was a good man, who loved his family, but he was an addict, so he loved his drugs more. When coming down from, his high, he would become abusive and use Chris's half-brother and me as his punching bags. As much as I wanted Chris to grow up with the love of a father like I had, I was not willing to risk my life for a two-parent household. I wasn't willing to allow my child to be abused nor was I willing to have him see me being abused and to accept that as a normal way to deal with women and children.

Corporate Office
9722 MacArthur Blvd., Oakland, CA 94605
(Tel) 310-270-3026  (Fax) 510-256-0156



CherylBryantBruceMD.com

I remarried 3 years after Christopher was born. Christopher was initially resistant to forming a relationship with my second husband Gregory David Bruce, but soon bonded strongly and fell in love with a man who didn't prove to be worthy of his affections. As it turned out, Greg was a sociopathic narcissist, with OCD and major depression, per report of his psychiatric evaluation. He was not capable of nurturing a child.

During Christopher's early years, he was a delightful child, with a charming and generous personality. He was extremely excited to welcome a new baby brother in 1993. However, his first jolt to his security came when I was just 7 months pregnant and I had to be air evacuated to an out of state hospital. Chris kept crying that he wanted his Mommy and he just wanted to sleep in his own bed. Chris was ecstatic and slightly clingy when we were reunited. He got over this quickly though and took to the role of playing the big brother with relish. He loved his baby brother and was VERY close to him.

When Gregory was born gravely ill, the rest of us appreciated the weight of it, but Chris never saw him as an ill child. He just saw him as a baby brother, which allowed them a special bond. Christopher fawned over Gregory.  He adored him.  Chris was very young, so it was hard to help him make sense of his world when the Tennessee Department of Children and Family Services came and took custody of his brother, accusing us of child abuse, following an accidental fall from the bed when Gregory was just 6 months old and weighed only 6 pounds (2lbs 6oz at birth).

In 1995, I had to do something to save my dying child, so I "kidnapped" Gregory from state custody to take him to Egleston Children's Hospital, so they could save his life. Christopher spent 10 years of his life under the microscopic lens of the media. Though I prevailed in saving my baby and bringing him home, I could not undo the damage that had been done.

My marriage was still young and never stood a chance against the weight of the situation in which we found ourselves, so Greg left us to move in with his mistress. One day when I wasn't home, the nanny said that he came in and packed up everything in front of Christopher. As Christopher tried desperately to engage Daddy, whom he hadn't seen in weeks, the nanny reported that Greg methodically collected his belongings without giving Christopher the time of day. At Christmas time, though he hadn't seen him in months, Christopher was absolutely convinced that Greg would come home for Christmas. He waited up Christmas Eve for as long as he could. Christmas Day, he waited expectantly, telling me that he knew Daddy was coming for sure that day. Then, late that night when the realization hit him that Daddy was not going to come, I heard the most piteous wail come from my child's bedroom as his heart broke into a million pieces. I can still hear that cry today.

II provided Chris with the best I could and for a while he was thriving. He had straight A's in his school work and had a highly inquisitive mind. He had a ballet scholarship and excelled in dance. He had a natural talent in the arts. I was a professional performer, and his father Bruce, was a Broadway star, one of Fosse's protégés. Chris, within a year of having started ballet, became the junior male lead in several productions before he was even 6 years old. When he was unfairly treated by the company director's wife, and the company director did not defend him he began withdrawing from ballet. When several disreputable boys who lived in the neighborhood where the dance school was located



CherylBryantBruceMD.com

were in the school harassing the girls, Chris defended the girls and went and sought help from the administrators. The boys were sent away, but later returned to corner Chris in the hall alone. They assaulted him, picking him up by his feet and throwing him to the ground on his head. He was hospitalized with a concussion. He left ballet shortly thereafter and began skateboarding, at which he also excelled, later being featured in many skateboard magazines, because of the beautiful artistic poses that resulted from his ballet training.

At the age of 12, his biological father asked to come meet him, claiming to be clean and sober. I had always been honest with Chris about why we split, but I had always shared his father's positive characteristics with Chris, so that he could appreciate that these traits had been handed down to him too. Chris was excited about sharing time with his father and wanted to tell him about all his accomplishments, especially as a skateboarder. He was not prepared for the reality of the dark side of his father though. Also narcissistic, Bruce could not see Chris. He was too busy trying to impress upon Chris that his father was a star, as if he needed to bow down and become some adoring fan. Chris just wanted a father who would watch him skateboard and be proud of him. .

As Gregory's health improved, we were able to move to California from Georgia to be closer to my family. In California, the kids and I were thriving.  Per their request, I put the kids back in public school. Chris fell in with the skateboard crowd. Since he was so far advanced of his peers, he quickly became bored with school and started cutting. I later found out that he would go to the library and work on a business plan to open his own Skate Shop. Then, unexpectedly, Gregory took a turn for the worse and died 6 months later. Chris was devastated. His entire world turned upside down.

Chris had the most difficulty of all of us in accepting Gregory's death. While his sister was acutely aware that he was gravely ill, because she was both older and she helped with administering his medications and physically caring for him, Christopher never really perceived him as sick. While the rest of us treated Gregory as a very fragile egg, Chris just saw him as a brother and would roughhouse with him, take naps with him, and pretend with him that his wheelchair was a racecar, while pushing him at breakneck speed down the sidewalk. When we chastised that he might break fragile Gregory, Gregory's orthopedist scolded us to let them both be boys, telling me that broken bones can be repaired, and so they went about being the best of friends. When Gregory died, Christopher's heart was shattered for a second time. This was the beginning of Christopher's descent into substance abuse. He got into minor trouble, nothing major and seldom attended school anymore, only going enough to ensure that his friends who had previously been failing, would pass with no less than B's. Meanwhile, although I would observe him do the homework every night, he would never turn even a single piece in. He appeared to be experiencing survivor guilt and was bent on his own self-destruction. The guy that I had been dating, whom Chris looked up to with the utmost respect ghosted us. Although I tried to support Chris as best I could, drowning in my own grief, I was emotionally unavailable to him and his sister. They watched me in fear, unable to protect or console me, just as I was unable to protect or console them. Chris started self-medicating with Xanax. He saw a psychologist both in Oakland and then again later in Texas, both of whom agreed that Christopher was under-water in grief and that the risk- taking behaviors and acting out that he was exhibiting were an effort to erase the numbness he was feeling, to make himself feel anything other than the numbness and the pain.



CherylBryantBruceMD.com

We moved to Texas, but our grief followed us. After he overdosed on Xanax in the summer of 2004, I took him to a low-quality rehab center, because it was all the insurance would cover. That was a mistake, because there, he was introduced to gang violence and forced to fight to protect himself, eventually putting another young man into the hospital. He came out of the facility with a diagnosis of bipolar disorder, for which he was medicated with marginal success. His experience at the facility worsened the behaviors. He seemed to struggle with wanting to be successful, wanting to please me, wanting to rescue me from my pain and with wanting to hurt himself and completely self-destruct.

We returned to California, to Beverly Hills in 2004. We were starting over. Chris was looking forward to starting fresh in a new school. He wanted to try out for the football team, and he looked forward to taking girlfriends to the proms. He wanted to try his hand at acting in school plays. When he arrived at Beverly Hills High however, he was once again derailed, when the school stamped him unfit to be on their main campus and relegated him to classes in an alternative "school" located in their parking lot in temporary structures, where they were not really educated, but rather were babysat. There, they were labeled as the "bad kids." He was not allowed to play football or any other sport for that matter. There were no school dances, no opportunities to audition for school plays, nor for that matter any opportunities to interact constructively with the "Good kids" at Beverly Hills High. Outside of the limited interaction he might have if his friends came over to his "campus," he was not allowed to even step foot on theirs during school hours. He expressed being in pain and feeling like his thoughts were all jumbled up. He was constantly seeking male approval and it seemed that the only place that he could consistently get it was from the streets. Each time he would come out, he would come out with new hope and limited resources and then get tripped up in stupidity, no doubt brought on by poor decisions spurred by drugs, and the drugs were the balm for the pain that he has yet to address.

Chris is not cut out for the "hard life." After his last prolonged stint in jail, when Chris came out, what I saw frightened me. He suffered from SEVERE post-traumatic stress disorder. He was merely a shell of who my son was for nearly a year.
He was withdrawn and seemed to feel unworthy of being present amongst the "good" people. He was experiencing extreme shame and appeared fearful of authority. His depression seemed quite profound. For nearly a year, I looked at my child and saw in him what he had once described in me. He was missing his sparkle. He never laughed. He always looked sad, just short of tears, but he never cried. He always looked nervous/anxious.

Chris is resilient though, so he once again turned to his skateboarding and his creativity to reconnect with himself. He once again turned to trying to help those who were less fortunate than him. He took pride in working with kids in DeFremery Park, teaching them skateboard skills, talking to them about self-esteem, encouraging them that they could do or be anything if they worked hard, giving them the male support that nobody had given him. He advocated for housing and resources for the homeless. He literally took in stray dogs, cats, and kids that littered the street and tried to save them all.

Chris is a gentle soul with many talents, many gifts. He is kind-hearted and would give the shirt off his back to help somebody who is hurting or in trouble. In the latter years, he developed a penchant for photography and had begun having success shooting modeling portfolios and marketing campaigns for stores in Carmel. He was shooting skateboard videos and music videos for professionals,



CherylBryantBruceMD.com

publications and music artists. He proved to be incredibly talented at it.  Chris has been loved on every job he has ever worked, but as his success increased on each job, he would always self-sabotage.

I understand that Chris's bad behavior cannot go unreprimanded, but Christopher needs help. He has tremendous potential, having so much to give. If given the appropriate tools, such as help transitioning back into society effectively and efficiently, including intensive psychological counselling to help him resolve his survivor guilt and his abandonment issues, I believe that Chris will be a tremendous asset, a significantly positive contributor to society.

We are waiting to embrace and support Christopher upon his release, but he will also need professional help putting the shattered pieces of himself back together, to re-establish his trust in authority and to empower him to believe that he too deserves a good life.

As a mother who loves her son, and sees his worth, I beseech you to take all these things into consideration as you deliberate on the sentencing of a mother's son, my son Christopher Gabriel Bryant-Bruce. He is so much more than meets the eye.

Thank you for taking the time to hear a mother's perspective on her prodigal son. We are desperately waiting to welcome him home.

Peace, Blessings, Health, & Longevity,

Cheryl BryantBruce MD
Enc

Corporate Office
9722 MacArthur Blvd., Oakland, CA 94605
(Tel) 310-270-3026  (Fax) 510-256-0156

# EXHIBIT 2

**EXHIBITS IN SUPPORT OF CHRISTOPHER BRUCE'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE**

10/21/21, 1:10 PM

Case 4:21-cr-00009-YGR Document 28 Filed 10/21/21 Page 16 of 19

A child shall lead them While Cheryl and Greg Bryant-Bruce were in the national spotlight fighting charges of child abuse involvin…

We've updated our Privacy Statement. Before you continue, please read our new Privacy Statement and familiarize yourself with the terms.

WESTLAW EDGE ○                                                                  CHRIST…   History   Folders   Favorites   Notifications        Sign out

Atlanta Journal Constitu…        February 18, 1996 a child shall lead them                                              Advanced

**A child shall lead them While Cheryl and Greg Bryant-Bruce were in the national spotlight fighting charges of child abuse involving their son G**
Mark Silk STAFF WRITER  •  Atlanta Journal and Constitution (GA)   (Approx. 5 pages)

Document

1 of 10,000 results              Original terms

NewsRoom

2/18/96 Atlanta J. - Const. M3

1996 WLNR 2939534

Atlanta Journal and Constitution (GA)
Copyright 1996 Atlanta Newspapers Inc.

February 18, 1996

Section: DIXIE LIVING

**A child shall lead them While Cheryl and Greg Bryant-Bruce were in the national spotlight fighting charges of child abuse involving their son Gregory, Greg was also waging a battle for his military career. They have emerged victorious in both arenas. Committed to caring A decorated flier An ill infant Searching for answers**

Mark Silk STAFF WRITER

Cheryl and Greg Bryant-Bruce can't go anywhere in Atlanta without being recognized as the couple who defeated Tennessee authorities last year, disproving charges that they abused their seriously ill 2-year-old son and reclaiming him from foster care.

It was the most public of times for the Bryant-Bruces. Night after night, their faces were splashed across local TV news. National news shows including "Dateline" and "Day One" dramatized their cause.

What most people don't know is that the young couple was waging another war against the powers that be at the same time they were fighting for their son.

Just after they were married in the summer of 1992, Greg, a decorated helicopter pilot in Desert Storm, found that his expected promotion had been turned down. Rather than go quietly, he mounted a three-year campaign in which he got his promotion, back pay and acknowledgment that he had been unjustly treated.

"I had my career stripped away, I had my first-born son stripped away," he said. "I had an overwhelming need for vindication.

"I believe in the principles of the Constitution. I believe in America. I wasn't about to roll over for the system. I'd done too many things, been too many places, worked too hard to carve out my niche in society."

Today, the Bryant-Bruces live in a rental home in a pleasant cul-de- sac in Jonesboro with their three **children**. Dominique, 9, and Christopher, 6, a Cheryl's **children** from an earlier marriage a dote on their little brother.

Baby Gregory, who will be 3 in June, is gaining weight and learning to crawl. He loves bouncing up and down in his Johnny Jump-up. The doctors, who once gave him two years to live, now say his liver should hold out until adolescence, when he could be eligible for a transplant.

But he is hardly a well **child**. He suffers seizures and cannot talk. Although the extent of neurological damage is not certain, it's clear he will never be a normal person.

"I look at him and know he won't have the kind of future I had growing up," said Greg. "He's been denied and stripped of those opportunities. It brings a feeling of dread and anger over me."

For her part, Cheryl, 35, is finishing up the last year of a residency at Morehouse School of Medicine and looking to join a family practice. Greg, 36, is stationed at Fort McPherson, working to organize the 10,000 military personnel who will be on hand to help stage the Olympics.

But the family's life is hardly back to normal.

Select Copy Citation to copy this document's citation to your clipboard, using the same format and style preferences as Copy with Reference.

We've updated our Privacy Statement. Before you continue, please read our new Privacy Statement and familiarize yourself with the terms.

against the Tennessee Department of Human Services and Vanderbilt Hospital for professional negligence and for violating their civil rights.

"This is something we have to do to make sure that the chances that this happens to anybody else are diminished," said Cheryl.

Determination might just as well be Cheryl Bryant-Bruce's middle name.

"Everything she's encountered, if she's run into some particular problem, she would fight through," said her father, Curtis Bryant of Sacramento, Calif. "Sometimes I really can't figure out where she got so strong from."

Bryant recalled how as a little girl Cheryl once rescued a litter of kittens someone had left to drown in a creek. For days she tried to coax them back to health, never giving up until the last one died.

Cheryl spent most of her childhood on air bases around the world, where her f ather was working on missiles and mobile communications systems. After his retirement the family moved to Sacramento, where she went to high school.

At the University of California--Davis, she studied veterinary medicine and Spanish, played the organ and became a professional dancer. With her dazzling good looks, she also found time to be crowned Miss Sacramento in 1980.

After graduation, she decided to become a general practitioner, joining the Army so she could pay her way through Tufts Medical School in Boston. Halfway through, she danced in the off-Broadway show "Ben."

"Entertainment," she said, "is my first love."

While in New York, she married an actor and became surrogate mother to Dominique, whom the couple eventually adopted. After a couple of years, Cheryl returned to medical school, then went to Fort Bragg, N.C., to fulfill her Army obligations.

But the marriage went bad, and she divorced after becoming pregnant with Christopher. Later she was transferred to Fort Campbell, Ky. There she met a tall, handsome young pilot named Gregory Bruce.

Greg was also a military brat, having grown up on various air force bases around the country and abroad. He started high school in Okinawa, finished up in Marion, S.C., and at 17 enlisted in the Air Force, becoming an emergency medical technician.

When his four-year hitch was over, he spent 2 1/2 years at the University of South Carolina, then entered the Army's flight training program. He did so well that when he was sent to Germany, the commanding general made him his personal helicopter pilot.

This was a signal honor, but as a freshly minted pilot a and the sole black officer in his flight group a it created no little resentment. His immediate supervisor contrived to alter his first three evaluations, giving him the lowest grade possible a a grade completely at odds with the high praise contained in his superiors' written reports.

But this only came to light years later.

After the Iraqi invasion of Kuwait, Greg was among the first American troops on the ground in Saudi Arabia as part of the 101st Airborne Division. When the time came for the allies to counterattack, he flew his scout helicopter 40 miles behind enemy lines as part of the force blocking the retreat of Iraq's Republican Guards.

He won three medals.

Detailed to Fort Campbell after Desert Storm, Greg began leading the social life of a bachelor aviator hero. A doctor at the base hospital, Capt. Cheryl Bryant, was different from other women he'd dated.

"I didn't want to involve her in my stupidities," Greg said.

But within a few months, their rather formal acquaintance blossomed into romance, and the two were married in August 1992, just before Greg was slated for a promotion and combat helicopter training in Germany.

In Washington, someone noticed the black marks on his early evaluations and turned the promotion down. Greg was devastated.

"I had on the rose-colored glasses," he said. Said Cheryl: "I was a lot more cynical. I'm (saying,) 'Wake up and smell the coffee. You're a black man, and you're about to be reamed.' "

It didn't take Greg long to discover what the problem was, but after six months of fighting to get the decision reversed, he resigned. A few days later, he received word of his promotion.

It would take another two years, with help from a letter from the White House, to undo the resignation. Last June, an Army review board concluded that he had been the victim of "error and injustice" and gave him his due.

Not long after he was born in June 1993, it was clear that there was something wrong with baby Gregory. Army doctors referred him to Vanderbilt Hospital, the nearest major hospital, 50 miles from Fort Campbell. There, doctors discovered that Gregory's liver lacked bile ducts

Select Copy Citation to copy this document's citation to your clipboard, using the same format and style preferences as Copy with Reference.

**We've updated our Privacy Statement.** Before you continue, please read our new Privacy Statement and familiarize yourself with the terms.

"I basically pissed them off," Cheryl said. "I had the audacity to stand up and question almighty white power."

Cheryl felt Vanderbilt's care was seriously wanting, particularly when her son's condition seemed to take a radical turn for the worse after a September hospital stay. She suspects that the hospital performed unacknowledged procedures on him then, and as evidence points to the fact that the hospital reimbursedthe couple's insurance company when it raised questions about the bill.

Though subpoenaed, the September records have never been produced by Vanderbilt.

On Dec. 6, 1993, the baby fell off the bed during changing, Cheryl said. Within a few hours he was doing very poorly, and she took him once again to Vanderbilt, despite her reservations.

This time, the hospital determined that because of past and recent hemorrhaging on his retinas, Gregory was a victim of shaken baby syndrome.

Three days later, the state Department of Human Services took him away from his parents and later won its court case. Although the Bryant-Bruces asked again and again for a second medical opinion, DHS and the Tennessee court officials refused.

It was an excruciating time.

"I had an utter sense of despair," said Greg. "I would get in my car, point it down the highway, and drive with no destination in mind."

Cheryl recalled Dominique, then only 6, saying, "They hate us, and they're not going to give the baby back. They are going to kill him."

To this day, Cheryl wakes up in the middle of the night in a cold sweat thinking her baby is gone.

During this time, they had the support of Greg's Masonic and Cheryl's Eastern Star lodges, and of their church, the First Missionary Baptist Church of Clarksville, Tenn.

"We gathered around them and supported them," said the Rev. Bobby Harris. "When they were in court, a few of my members went down to the courthouse."

Harris said he urged the couple to stick with the truth as they knew it, and that would set them free. "They are strong because they believe in their God," said Harris.

Greg also drew strength from people's outrage at what was happening to the couple.

Meanwhile, Cheryl began searching the medical literature for another explanation of the scar tissue on Gregory's retinas. Finally, in January 1995, she hit upon Alagille's syndrome, a rare liver disease that causes retinal scarring.

What convinced her this was the right diagnosis was finding a family in Florida with a daughter who has Alagille's. In a photo, the girl bore an astonishing resemblance to Gregory.

"I thought, now I have the answer, but I need a way to prove it," Cheryl said.

She, Greg and the two older **children** had moved to Atlanta a few months before so she could begin a residency in family medicine at Morehouse Medical School. She went to Egleston **Children's** Hospital to talk about Gregory's case, but the doctors told her they could do nothing without examining the **child**.

Meanwhile, Gregory was sinking fast. He gained no weight. He suffered intense seizures. When she paid her weekly parental visit, she often had to insist that he be taken to the emergency room.

So, overriding Greg's advice to wait a little longer, on Feb. 9, 1995, she grabbed the boy, ran to her car, strapped him into a car seat and drove straight to Egleston. After checking him in, she called Tennessee DHS and told them what she had done. She also alerted the news media.

"We were victims that really benefited from the court of public opinion," said Greg. "We knew we had to expose the situation. It was our only recourse."

Within a couple of weeks, the Egleston doctors confirmed Cheryl's preliminary diagnosis. On June 14, 1995, less than a week before Father's Day, the couple persuaded a Tennessee judge to return baby Gregory to them. DHS, which had fought the Bryant-Bruces every step of the way, put up no medical evidence of its own to convince the judge otherwise.

Since getting Gregory back, the whole family has been in counseling, which has helped them come to terms with what they've been through.

"I still feel victimized," Cheryl said. "I will feel raped for the rest of my life."

True to his disposition, Greg takes a rosier view.

"I don't feel like a victim of racism," he said. "I feel like a champion. I didn't lie down."

Select Copy Citation to copy this document's citation to your clipboard, using the same format and style preferences as Copy with Reference.

https://1.next.westlaw.com/Document/I908495a0d72c11d7974ae28ea439c4b6/View/FullText.html?navigationPath=Search%2Fv1%2Fresults%2Fnavig…                    3/4

We've updated our Privacy Statement. Before you continue, please read our new Privacy Statement and familiarize yourself with the terms.

have the nerve to do," they say.

"That's one of the reasons we can't just let it go," said Greg. "We have a mission."

Photo

Photo: Holding on: Gregory, 2, is comforted by his parents Cheryl and Greg Bryant-Bruce. Doctors once gave the baby two years to live; they now say he should live long enough to become eligible for a liver transplant. / DAVID TULIS / Staff Photo: Torn apart: Cheryl and Greg Bryant-Bruce, along with Dominique, 9, and Christopher, 6, watch as baby Gregory is taken back to Tennessee from Atlanta. / David Tulis / Staff Color photo and teaser box: (appeared on M/01 with reference to M/03 story) Cheryl and Greg Bryant-Bruce with son, Gregory

---- Index References ----

News Subject: (Race Relations (1RA49); Social Issues (1SO05); Health & Family (1HE30); Minority & Ethnic Groups (1MI43); Parents & Parenting (1PA25))

Industry: (Ground Forces (1GR94); Military Forces (1MI37); Aerospace & Defense (1AE96); Airborne Forces (1AI38); Defense (1DE43))

Region: (Americas (1AM92); North America (1NO39); Western Europe (1WE41); Middle East (1MI23); Germany (1GE16); Europe (1EU83); USA (1US73); Central Europe (1CE50); Tennessee (1TE37); Iraq (1IR87); Arab States (1AR46); California (1CA98))

Language: EN

Other Indexing: (101ST AIRBORNE DIVISION; AIR FORCE; ALAGILLE; ARMY; BRUCE; CHERYL; CHERYL BRYANT; DAVID; DHS; EGLESTON; GREG; GREGORY; GREGORY BRUCE; HOSPITAL; HUMAN SERVICES; MOREHOUSE MEDICAL SCHOOL; MOREHOUSE SCHOOL OF MEDICINE; REPUBLICAN GUARDS; STATE DEPARTMENT; TENNESSEE; TENNESSEE DEPARTMENT; TENNESSEE DHS; TUFTS MEDICAL SCHOOL; TV; UNIVERSITY; UNIVERSITY OF CALIFORNIA; VANDERBILT; VANDERBILT HOSPITAL; WHITE HOUSE) (Bobby Harris; Bryant; Cheryl; Cheryl Bryant; Christopher; Committed; Curtis Bryant; David Tulis; Dominique; Entertainment; Greg; Greg Bryant; Halfway; Harris; Johnnie Cochran; True)

Word Count: 2521

End of Document

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

**NewsRoom**

Contact us  •  Live chat  •  Training and support  •  Improve Westlaw Edge  •  Pricing guide  •  Sign out

1-800-REF-ATTY (1-800-733-2889)

THOMSON REUTERS

Westlaw Edge. © 2021 Thomson Reuters     Accessibility  •  Privacy  •  Supplier terms

Thomson Reuters is not providing professional advice

Select Copy Citation to copy this document's citation to your clipboard, using the same format and style preferences as Copy with Reference.